Shipman, D. J.
This is a motion to confirm the report of George P. Betts, Esq., to whom reference was made by order, dated March 8,1876, to ascertain the amount due from Holmes & Lissburger to Henry P. Hamill. Holmes & Lissburger filed exceptions to the report.
In May, 1874, the firm of Holmes & Lissburger and Henry P. Hamill were each large dealers of metals in the city of New York. Each was aware that the other was financially embarrassed and needed assistance to raise money. In that month Hamill applied to Holmes & Lissburger for the loan of their paper, to his order, to the amount of $60,000 or $70,000, and as an inducement to this loan offered to loan them a lot of pig iron and railroad iron, with the right to hypothecate the same for their own benefit. These loans were made. Holmes & Lissburger loaned Hamill $68,000 of their paper, the earliest note maturing September 19,1874, and he loaned them about 2,000 tons of iron, to be returned, or to be returned in iron of equal amount and value. This iron they pledged to various parties as security for their indebtedness. The notes were not given in payment for the iron, which was treated as a loan to the firm and was entered among their loan accounts. Hamill agreed to pay these notes as they matured, and thus the iron would be, in effect, a security against his default, for Holmes & Lissburger would have the property in their control, with which they could secure themselves for the *154 payments which they might b8 compelled to make upon the notes.
Subsequently about 2,000 more tons of iron were loaned by Hamill, more notes were loaned by Holmes & Lissburger, and exchange notes were-also loaned between the parties, until on July 29, 1874, the firm had received from Hamill, 3,962 tons of iron, and his accommodation notes to the amount of $109,929.88. Two of these notes, amounting to $11,877.11, were not in existence at the time of the subsequent bankruptcy of the firm, and two more, amounting to $12,213, had been paid to the Shoe & Leather Bank, leaving $85,839.77 due, provable and proved against their estate by various holders for value.
On July 29,1874, Hamill had received from Holmes & Lissburger their accomodation notes for-$167,039.97, of which he subsequently returned $39,809.10. The residue, amounting to $127,230.89, he had indorsed,, and had used for his own benefit. Each party had agreed to pay the. notes of which they were respectively makers, except the $68,000 as aforesaid.
Hamill suspended payment July 28, 1874, and Holmes & Lissburger stopped payment on the next day. The firm immediately commenced endeavoring to compromise with their creditors, and it became necessary to have an adjustment of accounts with Hamill. The iron had been hypothecated, and was being sold from time to time by the pledgees upon a falling market.
Up to this time no price for the iron had been agreed upon, and the account was, consequently, in a very unsettled state. Lissburger had interviews with Hamill, and it was in substance agreed, on or about August 25, 1874, that the loan should be treated as a purchase for $134,214, its cost to Hamill. It was also agreed that Holmes & Lissburger should, in addition to the $134,214, be charged with all the notes and cash which they had received from Hamill, and be credited with all the notes which Hamill had received and had not returned, or should not return.
The idea that Hamill was to pay the $68,000 notes does not *155 seem to have been entertained at this time, but all the notes were either then regarded or had been previously regarded as exchange notes. Hamill, on or about the same day, at the request of Lissburger, signed a composition agreement for his debt. Opposite to his signature the debt was entered at “about $184,000,” in Lissburger’s handwriting. This composition apparently fell through, and about January 9, 1875, a petition in bankruptcy against the firm was filed by Lissburger. Before adjudication, a composition of 15 per cent was agreed to by a sufficient amount of the creditors in number and value. This composition has been paid to all the creditors, except to Mr. Sinclair, the receiver of Hamill’s estate. The estate is confessedly insolvent. Prom a notice, which was put in evidence, it seems that he was adjudged a bankrupt by the district court for the eastern district of Arkansas, about September, 1876.
Mr. Holmes paid a composition of 15 per cent, upon $85,839.77 to the various holders of the Hamill paper indorsed by Holmes & Lissburger. He also paid the same composition upon $50,968 of the $68,000 notes first loaned by his firm to Hamill. $17,032 of these notes were not used.
In addition to the purchase of the iron, Holmes & Lissburger owed Hamill, at the time of their bankruptcy, $9,024 for cash borrowed. The commissioner states the account as follows :
Holmes & Lissburger, Dr.
To amount of iron purchased, • $134,214 00
To amount of cash borrowed, * • 9,024 00
$143,238 00

Cr.

Bank, .... $12,113 00
By payment of 15 per cent, on other notes of Hamill, • • * 12,871 34
$24,984 34
Balance due from Holmes & Lissburger to Hamill, - $118,253 66
*156 The receiver takes no exception. I think that the commissioner made a clerical error of $100 in the amount paid to the Shoe & Leather Bank, and there is a slight discrepancy between his figures and those furnished to me as correct, of the amount which was paid upon the composition.
The receiver admitted, in his proof of debt, that Hamill promised to pay his own notes at maturity, and that the Holmes & Lissburger notes had been used by Hamill for his own benefit. The Citizens’ Bank of Waterbury recovered judgment against Hamill txpon some of their last' mentioned notes, and upon the proceedings under their judgment Mr. Sinclair was appointed receiver. The errors which are alleged by Holmes & Lissburger are substantially as follows:
1. An error of $68,000 in not deducting that sum from the amount charged to Holmes & Lissburger for the iron, for the amount of notes advanced by Holmes & Lissburger to Hamill, when they received the iron from him, which Hamill had discounted for his own use, receiving the proceeds thereof.
2. An error of $50,000 in charging Holmes & Lissburger with the iron at $134,214, instead of at $84,724.71, its value at the time of the filing of the petition to have Holmes & Lissburger adjudicated bankrupts.
3. An error in allowing the credit for the 15 per cent, paid on Hamill’s notes to the amount of $85,808.93, since the proceedings in bankruptcy were commenced, by way of composition, as a reduction of the principal debt on which the composition is computed, instead of allowing it as a payment of so much of the composition itself.
The second error has been disposed of by the findings of fact. In regard to the first alleged error it is to be noticed that the notes for $68,000 were not given in payment for the iron. Like all the other notes, they were accommodation notes loaned to Hamill. By the agreement which was entered into about August 25, 1874, if there ever had been an idea that these notes were to be set off against the iron, that idea was abandoned, and all the notes were treated as exchange notes.
The third error involves a question of law. The rule *157 .seems to have become well established in England, that where two bankrupt parties have each given cross accommodation bills or notes to the other prior to their bankruptcy, which bills or notes have been indorsed, and are outstanding and unpaid at the time of the bankruptcy of such estate, and which have been proven against such estate by the holders, and a cash balance was also due from one estate to the other at the time of the bankruptcy, such cash balance only is provable, and that the outstanding bills or notes, or any dividends which may be paid thereon, cannot be proved by one estate against the other, unless the creditors of one estate have been paid in full and such estate has a surplus. This doctrine wasf after argument, in which the hardships of the rule were fully set forth by counsel, declared in Ex parte Laforest, Mont. & Bligh, 363, to be the existing English doctrine. The judges based their decision upon Ex parte Walker, 4 Ves. 373, which case was substantially affirmed in Ex parte Earle, 5 Ves. 833, and in Ex parte Rawson, 1 Jacob, 274. The case of Ex parte Metcalf, 11 Ves. 404, in which a different principle is recognized or asserted by Lord Edon, does not seem to have shaken the opinion of the court in Ex parte Laforest.
ha. Ex parte Walker, Lord Loughborough places his decision upon the ground that if the estate of the accommodation maker should be permitted to prove against the other estate the dividend which had been paid by the estate of the maker, when the note had also been proved by the holder against both estates, the same debt, or a part thereof, would be proved twice, which would operate as a hardship upon the creditors of the estate then paying an additional dividend. In Ex parte Rawson Lord Eldon says: “If so much of the account as consists of bills, consists of bills that may be proved against both estates, how is it possible, till the creditors proving them are satisfied, that one estate can make any proof against the other with reference to these bills ? How can they be allowed to come into competition with their own creditors?”
The theory of the rule is that the holder of each indorsed note, who presents it as a claim for its full amount against such estate, draws from such estate the full share of the *158 assets of each concern to which the indebtedness represented by that note is entitled. If the indorser has not paid the note he cannot present it against the maker’s estate, bwt the holder is entitled to the entire dividend. Neither can the indorser present it indirectly by using the dividend which he has paid upon it as .a set-off to diminish the assets of the maker’s estate. No debt is to be proved twice. So, then, if each of the estates in this case were in bankruptcy, neither could present its unpaid indorsements or the dividends which had been paid thereon against the other. It is true .that Hamill’s estate is not in bankruptcy in New York, and it is not proved to be in bankruptcy in Arkansas, but the receiver had no right to present against the bankrupt’s estate the notes which Hamill had indorsed, because Hamill had paid nothing and was not the owner. If the receiver had paid simply a dividend on these notes to the holders, it would seem that the principle of the English rule would be applicable, and that the amount of the dividend could not be presented against the bankrupt’s estate, because the notes had been presented once and had drawn their full proportion of the assets of the estate.
Hamill’s claim, then, against the bankrupts’ estate was the price of the iron and the cash loaned. The remaining question is, should the composition, being $12,871.34, which was paid upon the notes, amounting to $85,839.77, of which Hamill was maker, be deducted from the composition which is due to Hamill’s estate, or should it be deducted, if deducted at all, from the principal of the Hamill debt ?
The theory of a composition is that the cash value of the bankrupts’ estate is substantially divided among the creditors in proportion to their respective debts. The bankrupts owed to Hamill, and to the owners of the Hamill notes, debts of at least $171,679.54, and showed assets sufficient to pay 15 per cent, thereof, and had agreeed to pay that percentage. Upon the theory of Holmes & Lissburger this obligation is satisfied by the payment of 15 per cent, upon $85,839.77, and by pocketing the other 15 per cent., whereas, by the payment of *159 the dividend upon the Hamill notes, the indebtedness to Hamill’s estate is reduced only $12,871.34.
In this way Holmes & Lissburger pay Hamill’s estate nothing for its debt of $85,839.71, and receive full payment from his estate of the set-off of $12,871.34. The question, how much do the bankrupts owe Hamill upon a settlement of accounts, is lost sight of, and the erroneous assumption is made that the 15 per cent, is the entire debt of Holmes & Lissburger, and that it can, therefore, be set off against the entire debt of Hamill’s estate.
Again, Hamill’s estate is entitled to receive from Holmes & Lissburger its debt, less the amount paid for its benefit by the bankrupts. The theory of Holmes & Lissburger ignores the state of the account between the parties, and exalts the payment of a composition into the payment of a debt, and compels Hamill’s estate to receive nothing; not because the indorsers have paid all the notes, and have, therefore, a complete set-off, but because they have paid only 15 per cent, of the debt. If Hamill had paid 50 per cent, upon the $127,-230.89 for which Holmes & Lissburger were primarily liable, would it be contended that the composition which they had paid upon the $85,839.77 should be set off against the composition which they were to pay upon this part of their indebtedness to Hamill? In brief, the composition is to be paid upon the balance due to Hamill’s estate, simply because Holmes & Lissburger owe that sum, and have no supreme right to receive their side of the account in full.
I am aware of the able opinion In re Purcell, 18 N. B. R. 447, and of the great respect which is due to a decision of Judge Choate, but I think that the strong equities in that case against an acceptance of the composition perhaps led the court into the line of reasoning which he adopted.
The exceptions are overruled. The motion to confirm the report is granted.